UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       -v.-

JOSE TORO NARANJO,
   a/k/a "Jorge Ivan Toro Naranjo,"
   a/k/a "Don Marcos," and
RAFAEL DE JESUS RICAURTE-GOMEZ,
   a/k/a "Naruto,"
   a/k/a "Rafa,"

               Defendants.

15 Cr. 109 (NRB)

# THE GOVERNMENT'S OPPOSITION TO THE DEFENDANTS' MOTION TO DISMISS AND DISCOVERY MOTIONS

PREET BHARARA,
United States Attorney for the
Southern District of New York,
*Attorney for the United States*
*of America*

Brendan Quigley,
Negar Tekeei,
Mathew Laroche,
*Assistant United States Attorneys*
*Of Counsel*

## **TABLE OF CONTENTS**

RELEVANT BACKGROUND ................................................................................ 3

PROCEDURAL HISTORY ................................................................................ 5

ARGUMENT ............................................................................................... 6

I.     Toro Naranjo's Motion to Dismiss the Indictment Should Be Denied .............................. 6
       A.     Applicable Law ................................................................................ 6
       B.     Discussion .................................................................................... 8
              1.     The Defendants Have Not Established Outrageous Government
                     Conduct .............................................................................. 8
              2.     The Defendants Are Not Entitled to an Evidentiary Hearing ................. 14

II.    The Defendants' Request for *Brady* Material is Moot and the Request for Early
       Production of *Giglio* Material and Rule 404(b) Evidence Should Be Denied ................. 14
       A.     The Government is in Compliance With Its *Brady* and *Giglio* Obligations ....... 15
       B.     Rule 404(b) Notice .......................................................................... 17

III.   Ricaurte-Gomez's *Pro Se* Suppression Motion Should Be Denied ............................. 18

CONCLUSION ............................................................................................. 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JOSE TORO NARANJO,
    a/k/a "Jorge Ivan Toro Naranjo,"
    a/k/a "Don Marcos," and
RAFAEL DE JESUS RICAURTE-GOMEZ,
    a/k/a "Naruto,"
    a/k/a "Rafa,"

                  Defendants.

15 Cr. 109 (NRB)

       The Government respectfully submits this memorandum of law in opposition to (i) the motion to dismiss the Indictment on the basis of alleged outrageous government conduct and for production of materials subject to *Giglio*, *Brady*, and Federal Rule of Evidence 404(b), filed by defendant Jose Toro Naranjo (Dkt. No. 35), which was joined by defendant Rafael De Jesus Ricaurte-Gomez (Dkt. No. 45); and (ii) the motion to suppress certain evidence, filed *pro se* by Ricaurte-Gomez (Dkt. No. 48).

       The motion to dismiss the Indictment because of purported outrageous government conduct is wholly without merit and should be denied without a hearing.  In support of that motion, Toro Naranjo alleges, among other things, that a Drug Enforcement Administration ("DEA") confidential source (the "Source") was committing crimes while working for the DEA.  The Government has conferred with the DEA agents involved in this investigation and believes the allegation that any confidential source was engaged in criminal activities is simply false.  Regardless, Toro Naranjo's contention that the DEA actually permitted the Source (or any confidential source) to commit any crime is an extraordinary accusation that is entirely baseless.

In fact, Toro Naranjo does not allege any firsthand knowledge to support this accusation but instead relies *solely* on an online news article from 2011 posted by a Colombian website that cites unnamed sources.  The news article is inadmissible hearsay, *see, e.g.*, *Sanders* v. *City of N.Y.*, No. 98 Civ. 3374 (VM), 2001 WL 1568422, at *3 (S.D.N.Y. Dec. 5, 2001), and Toro Naranjo's argument should be rejected for what it is—a transparent attempt to undermine the DEA's integrity without any evidence.

Nevertheless, even accepting all of Toro Naranjo's allegations as true, they do not rise to the level of outrageous government conduct justifying dismissal of the Indictment.  Courts have widely held that "to be 'outrageous,' the government's involvement in a crime must involve either coercion or a violation of the defendant's person."  *United States* v. *Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011).  But Toro Naranjo does not in any way allege that he was forced or coerced into agreeing to participate in the charged narcotics conspiracy.  Thus, his claim fails as a matter of law.  *Id.* (citing cases).

The defendants' discovery motions should also be denied.  The Government is aware of its obligations under *Brady* and *Giglio*, is currently in compliance with those obligations, and will remain in compliance with those obligations in the future.  Moreover, issues of safety and ongoing investigations weigh strongly against requiring the disclosures the defendants seek, including the identity of confidential sources.  Finally, Ricaurte-Gomez's *pro se* motion to suppress essentially all discovery in this case lacks merit and should be denied in its entirety.  For all of these reasons and those discussed below, the defendants' motions should be denied.

## RELEVANT BACKGROUND

The defendants are charged with participating in a cocaine-importation conspiracy relating to their agreement to transport 1,000 kilograms of cocaine into the United States in or about February 2015.  The defendants were identified as part of a DEA investigation based in New York and Mexico City that began in the fall of 2014.  Based on that investigation, the DEA identified Toro Naranjo as a leader in Clan Usuaga, a large-scale Colombian drug trafficking organization (the "DTO").  The DEA also identified Ricaurte-Gomez as one of Toro Naranjo's associates.

In the fall of 2014 and early 2015, at the direction of the DEA, a DEA confidential source ("CS-1")[1] contacted Toro Naranjo and discussed a transaction in which Toro Naranjo would supply a significant quantity of cocaine to individuals in Mexico.  During those conversations, which were recorded, Toro Naranjo represented to CS-1 that he (Toro Naranjo) had access to multi-ton quantities of cocaine and that he was able to transport the cocaine from Colombia to Mexico.

As a result of those discussions, a meeting was arranged on February 4, 2015 in Cartagena, Colombia, involving three DEA confidential sources ("CS-2", "CS-3" and "CS-4")[2]

---

[1]     CS-1 is a paid DEA confidential informant who has provided reliable information in connection with past investigations.

[2]     CS's 2, 3, and 4 are paid DEA confidential informants who have provided reliable information in connection with past investigations.

3

and Ricaurte-Gomez (the "First Meeting").   The First Meeting was audio recorded and was surveilled and photographed by members of the Colombian Sensitive Investigation Unit.   During the First Meeting, Ricaurte-Gomez told CS's 2, 3, and 4 that he could send 1,000 kilograms of cocaine to Vera Cruz, Mexico via container ship.   CS-2 told Ricaurte-Gomez that CS-2 could transport the 1,000 kilograms of cocaine from Vera Cruz, Mexico to New York.   Ricaurte-Gomez replied that he would be interested in sending between 150 and 250 of the 1,000 kilograms to New York.   Ricaurte-Gomez agreed to meet again with CS's 2, 3, and 4.

Later that day, another meeting took place in Cartagena (the "Second Meeting") involving CS's 2, 3 and 4, and Ricaurte-Gomez and Toro Naranjo.   The Second Meeting was also audio recorded and was surveilled and photographed by members of the Colombian Sensitive Investigation Unit.   During the Second Meeting, several bodyguards of Toro Naranjo and Ricaurte-Gomez were present, and the parties again discussed the plan to ship 1,000 kilograms of cocaine from Colombia to CS-2 in Vera Cruz, which CS-2 would then transport to New York via tractor trailer.   The parties also agreed that 500 kilograms would belong to Toro Naranjo and Ricaurte-Gomez and that CS-2 would purchase 500 kilograms from Toro Naranjo and Ricaurte-Gomez at $3,500 per kilogram.   Furthermore, CS-2 agreed to pay for CS-2's 500 kilograms before they were sent from Colombia to Vera Cruz.   It was further agreed that CS-2 would be responsible for transporting all 1,000 kilograms from Vera Cruz to New York via truck and that CS-2 would give Toro Naranjo and Ricaurte-Gomez the profits from the 500 kilograms belonging to Toro Naranjo and Ricaurte-Gomez.

At the conclusion of the Second Meeting, and through follow-up electronic

communications between Toro Naranjo and CS-1, the parties agreed that CS's 2, 3, and 4 would meet Toro Naranjo and Ricaurte-Gomez in Cartagena on or about March 4, 2015 to pay for their 500 kilograms of cocaine and that, also on or about that date, the full 1,000 kilograms would be shipped from Colombia to Vera Cruz, Mexico.  On or about March 4, 2015, Toro Naranjo and Ricaurte-Gomez were arrested on the charges in the Indictment as they were waiting in a restaurant in Cartagena to receive the payment from CS's 2, 3, and 4.

## PROCEDURAL HISTORY

On February 26, 2015, the defendants were charged in Indictment 15 Cr. 109 (NRB) with participating in a conspiracy to import cocaine into the United States, in violation of Title 21, United States Code, Section 963.  Following their arrest on March 4, 2015, the defendants were extradited to the United States in February 2016.

The Government began producing discovery in March 2016.  The Government's productions have included:  (i) extensive recorded communications between Toro Naranjo and confidential sources; (ii) audio and video recordings of the two meetings involving the defendants and confidential sources; (iii) draft summary translations relating to many of the consensual recordings and communications; (iv) email data relating to an account maintained by Toro Naranjo, obtained pursuant to a search warrant; (v) documents obtained pursuant to a request for legal assistance to the Government of Colombia (the "MLAT"); and (vi) applications for the email search warrant and MLAT that provide narrative descriptions of the evidence and summaries of certain anticipated witness testimony.  In cover letters accompanying productions to the defendants, the Government stated that it recognizes its obligations under *Brady* and that

5

the Government is unaware of any *Brady* material regarding the defendants.

## ARGUMENT

I.     **Toro Naranjo's Motion to Dismiss the Indictment Should Be Denied**

Toro Naranjo seeks dismissal of the Indictment, contending that the Government engaged in outrageous conduct by relying on the Source who allegedly set up Toro Naranjo because Toro Naranjo owed the Source a debt from a real-estate transaction.  Toro Naranjo also accuses the Government of knowing that the Source was committing crimes while acting as an informant for the DEA.  Even assuming those accusations are true, which they are not, they do not even "remotely constitute the kind of 'outrageous' conduct that implicates due process concerns." *Al Kassar*, 582 F. Supp. 2d at 493.

A.     **Applicable Law**

The Fifth Amendment to the Constitution of the United States provides, in pertinent part, that: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  In *Hampton* v. *United States,* 425 U.S. 484, 493-94 (1976), the Supreme Court recognized the possibility that government involvement in a crime might become so "outrageous" that it violates the Fifth Amendment Due Process rights of a defendant.  *See Al Kassar*, 660 F.3d at 121 ("Government involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped.").

Since *Hampton*, only one Court of Appeals has ever invalidated a conviction on the basis of outrageous government conduct.  *See United States* v. *Twigg*, 588 F.2d 373 (3d Cir. 1978);

6

*see also United States* v. *Lakhani*, 480 F.3d 171,181 (3d Cir. 2007) (noting that *Twigg* is the only appellate decision to have "recognized a violation of due process as set out by Justice Powell in *Hampton*").  Indeed, outrageous government conduct is "an issue frequently raised that seldom succeeds."  *United States* v. *Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997); *accord United States* v. *LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) ("Such a claim rarely succeeds."); *United States* v. *Santana*, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of outrageous misconduct is often raised but seldom saluted.").  In light of this record, the defense has been called "moribund," *Santana*, 6 F.3d at 4; "hanging by a thread," *United States* v. *Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998); and even "[s]tillborn," *United States* v. *Boyd*, 55 F.3d 239, 241 (7th Cir. 1995).  Courts have questioned whether the doctrine still exists, *see United States* v. *Tucker*, 28 F.3d 1420, 1425-26 (6th Cir. 1994), and one Court has gone so far as to reject it altogether, *see Boyd*, 55 F.3d at 241 (holding that "the doctrine does not exist in [the Seventh C]ircuit").

To establish a violation of due process on the basis of outrageous conduct, a defendant must show government conduct so outrageous that "common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction."  *Al Kassar*, 660 F.3d at 121 (quoting *United States* v. *Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)); *see also United States* v. *Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (same).  To be outrageous, the conduct must "shock[] the conscience," meaning that "the government's involvement in a crime must involve either coercion or a violation of the defendant's person."  *Al Kassar*, 660 F.3d at 121; *see also United States* v. *Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) (same); *Schmidt*, 105 F.3d at 91; *United States* v. *Rahman*, 189 F.3d 88, 131 (2d Cir. 1999) ("The paradigm examples of conscience-

shocking conduct are egregious invasions of individual rights."); *United States* v. *Myers*, 692 F.2d 823, 837 (2d Cir. 1982).

Defendants' bringing such claims have a "very heavy" burden because courts are required to be deferential to the Government's "choice of investigatory methods." *See Rahman,* 189 F.3d at 131 (internal citation omitted). "It does not suffice to show that the government created the opportunity for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive. Likewise, feigned friendship, cash inducement, and coaching in how to commit the crime do not constitute outrageous conduct." *Al Kassar,* 660 F.3d at 121 (internal citations omitted). Thus, even a sting operation that involves "government creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits." *Cromitie,* 727 F.3d at 219. Notably, "[t]he Second Circuit has yet to identify a particular set of circumstances in which government investigative conduct was so egregious that it shocked the conscience and violated fundamental guarantees of due process." *United States* v. *Davis*, 57 F. Supp. 3d 363, 366-67 (S.D.N.Y. 2014) (citing cases).

**B.    Discussion**

1.    The Defendants Have Not Established Outrageous Government Conduct

Toro Naranjo's outrageous government conduct claim should be rejected as a matter of law: Toro Naranjo does not in any way allege that he was forced or coerced into agreeing to participate in the charged narcotics conspiracy; indeed, there are no allegations that threats were made, violence was used, or that Toro Naranjo agreed to participate in the

transaction unwillingly.  In these circumstances, it is well settled that claims of outrageous Government conduct fail.  *See, e.g.*, *Bout*, 731 F.3d at 239 ("[The defendant] has not alleged anything akin to either coercion or a violation of his person, which would be necessary, at a minimum, to prevail on an outrageous government conduct charge." (internal quotation marks and citation omitted)); *Cromitie*, 727 F.3d at 221 ("There was no coercion of any sort, no suggestion of duress and no physical deprivation." (internal quotation marks and citation omitted)); *Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) ("The defendants allege no coercion, intimidation, or physical force by the DEA agents."); *United States* v. *Chin*, 934 F.2d 393, 399 (2d Cir. 1991) (same); *Davis*, 57 F. Supp. 3d at 367 (same); *United States* v. *Colon*, 71 F. Supp. 3d 269, 276 (D. Conn. 2014) ("[T]here is no evidence that law enforcement coerced or physically violated any of the defendants in order to convince them to participate in the drug stash-house robbery scheme.").

Ignoring this clear precedent, Toro Naranjo instead argues that the following facts amount to outrageous government conduct: (i) the DEA knew (or should have known) that the Source was engaged in other criminal activities while the Source was working for the DEA; (ii) Toro Naranjo owed the Source a debt from a real estate transaction and so the Source induced Toro Naranjo to participate in the drug deal to reimburse the Source; and (iii) the drug deal involved multiple confidential sources.  None of these allegations, either separately or in combination, rises to the legal standard of outrageous.

First, Toro Naranjo's claim that the DEA knew or should have known that the Source was committing crimes is without merit.  Toro Naranjo has no firsthand knowledge to

9

support this accusation and instead relies solely on an online article posted by a Colombian news organization that cites unnamed sources.  This article is inadmissible hearsay that should not be considered in assessing Toro Naranjo's motion.  *See, e.g.*, *Sanders*, 2001 WL 1568422, at *3; *McCallister* v. *New York City Police Department*, 49 F. Supp. 2d 688, 706 n.12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom . . . ."); *In re Columbia Securities Litigation*, 155 F.R.D. 466, 475 (S.D.N.Y. 1994).

But even assuming, *arguendo*, that this accusation is true—*i.e.*, that the DEA knew or should have known the Source was committing crimes—this in no way implicates the defendants' due process rights.  In fact, the accusation has nothing to do with the defendants at all and instead focuses on alleged conduct of the Source completely unrelated to the charged offense.  Thus, this allegation fails as a matter of law to support a claim of outrageous government conduct.  *See, e.g.*, *United States* v. *Heyward*, No. 10 Cr. 84 (LTS), 2010 WL 4484642, at *5 (S.D.N.Y. Nov. 9, 2010) (explaining that defendant's argument that the indictment should be dismissed because "the government's allegedly negligent oversight of the Informant enabled him to engage in outrageous conduct" was "inconsistent with the centrality of active, intentional investigative misconduct to the few decisions in which indictments have been dismissed on due process grounds"); *United States* v. *Brooke*, No. 93 Cr. 595 (LAP), 1995 WL 23546, at *3 (S.D.N.Y. Jan. 23, 1995) ("[The defendant] has not cited any case in which the government's failure to supervise an informant was found to constitute outrageous government

conduct. Thus, even accepting [the defendant's] characterization of the facts, the government's conduct does not approach the outrageous conduct required to dismiss an indictment.").

Second, that the Source was allegedly motivated by a real estate debt to involve Toro Naranjo in the drug deal is irrelevant. The Source's subjective intent has nothing to do with whether Toro Naranjo was forced or coerced into agreeing to participate. Indeed, Toro Naranjo does not allege that he was forced or coerced to participate in the drug deal because of the real estate debt. Thus, this allegation, even if true, also fails as a matter of law to support a claim of outrageous government conduct. *United States* v. *Borrero*, No. 13 Cr. 58 (KBF), 2014 WL 5493241, at *4 (S.D.N.Y. Oct. 30, 2014) ("Absent conscience-shocking conduct such as coercion, intimidation, or physical force, sting operations do not violate due process.").

Finally, that the proposed drug-deal involved multiple informants does not amount to outrageous conduct. The sting operation in this case was certainly not more elaborate than the investigation at issue in *Myers* (an extensive sting operation involving bribes of $50,000 to participants), which the Second Circuit found was "not even close to the line." 692 F.2d at 843 (citing with approval one case rejecting a due process challenge to undercover operations where a "defendant was solicited twenty times before committing an offense" and another where the defendant "was tempted by a million-dollar cash deal and prodded by veiled threats"); *accord Schmidt*, 105 F.3d at 91 (rejecting a due process challenge where the Government's involvement in the defendant's plot was "extensive"). At most, it could be said that the Government's investigation in this case "creat[ed] . . . an opportunity for the commission of crime by those willing to do so." *Myers*, 692 F.2d at 837. But that is not a due process violation. *See, e.g.*,

11

*Rahman*, 189 F.3d at 131 (holding that a government informant's involvement in a conspiracy to bomb targets in New York City, allegedly consisting of lending direction, technical expertise, and critical resources, did not shock the conscience, and noting that "[u]ndercover work, in which a Government agent pretends to be engaged in criminal activity, is often necessary to detect criminal conspiracies"); *Schmidt*, 105 F.3d at 91-92 (rejecting a due process challenge where law enforcement officers posed as hit men and actually conducted a controlled breakout of the defendant from a mental observation jail unit where she had been held, and remarking that "there are occasions when the government is required to appear to participate in a criminal conspiracy in order to gather evidence of illegal conduct"); *LaPorta*, 46 F.3d at 160 (finding no due process violation where a government informant provided a government-owned car to the defendant to be burned); *see also Lakhani*, 480 F.3d at 182-83 (holding that due process was not violated by a sting operation even though the Government acted as both the buyer and seller in a supposedly illegal arms transaction and a Government informant first suggested the criminal activity to the defendant — in part because the defendant used his own knowledge of the arms-trafficking business in committing the crime).

The defendant's reliance on the Third Circuit's decision in *Twigg*—the only appellate case since *Hampton* to find a due process violation from Government involvement in criminal activity—is also unavailing. *Twigg* involved an undercover narcotics investigation where the Government (through an informant) first proposed setting up a methamphetamine laboratory, provided all "the necessary equipment, raw materials, and a production site," *and* "completely" ran the laboratory—with only "minor" assistance, "at the specific direction" of the

informant, from the defendants.  588 F.2d at 375-76; *see Nolan-Cooper*, 155 F.3d at 230 (stating that *Twigg* "involved a quite egregious case of government over involvement in which the government's undercover operative essentially concocted and conducted the entire illicit scheme").  Notwithstanding these extreme facts, there is reason to question the Third Circuit's finding of a due process violation, if only because it relied on cases predating the Supreme Court's decision in *Hampton.  See, e.g.*, *United States* v. *Beverly*, 723 F.2d 11, 12 (3d Cir. 1983) (noting that the majority in *Twigg* had relied on *United States* v. *West*, 511 F.2d 1083 (3d Cir. 1975), which was "limited by *Hampton*"); *see also United States* v. *Tucker*, 28 F.3d 1420, 1425-26 (6th Cir. 1994) (noting that *Twigg* "has been greatly criticized, often distinguished and . . . [even] disavowed in its own circuit" (citing *Beverly*, 723 F.2d at 12)).

Even if correct, however, *Twigg* is easily distinguished from the present case, since it can hardly be said here that the Government "conducted the entire illicit scheme." Among other things, it was the defendants who represented that they had access to 1,000 kilograms of cocaine and that they were able to transport the cocaine from Colombia to Mexico. In short, the defendants themselves were no novices to international narcotics trafficking.  *Cf. Lakhani*, 480 F.3d at 182 (finding *Twigg* inapplicable where the defendant had "used his *own* knowledge of the arms business for the benefit of the illegal scheme," had traveled internationally, had communicated with arms companies, had created fraudulent shipping documents, and had "deployed his own money laundering network").

In sum, "[w]hatever may be the due process limit of governmental participation in crime, it was not reached here." *Myers*, 692 F.2d at 837.  The defendants' motion to dismiss the Indictment should be denied.

2.      The Defendants Are Not Entitled to an Evidentiary Hearing

A hearing is not necessary to address an allegation of outrageous government conduct where there are no disputed facts or where the defendant's allegations even if accepted as true fail as a matter of law.  *See, e.g.*, *LaPorta*, 46 F.3d at 160; *United States* v. *Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991).  As set forth above, the Government disputes many of the allegations in Toro Naranjo's motion.  Nevertheless, even crediting those allegations as true, they fail to amount to outrageous government conduct as a matter of law.  Accordingly, Toro Naranjo is not entitled to a hearing on his motion.  *See, e.g.*, *United States* v. *Gomez*, 83 F. Supp. 3d 489, 494 (S.D.N.Y. 2014) (denying request for hearing because even "assuming Gomez's account of the investigation is true, the conduct alleged does not amount to outrageous conduct."); *Brooke*, 1995 WL 23546, at *3 (same).

## II.      The Defendants' Request for *Brady* Material is Moot and the Request for Early Production of *Giglio* Material and Rule 404(b) Evidence Should Be Denied

Toro Naranjo argues that he does not have access to *Brady* and *Giglio* material that is necessary to prepare his defense.  He also requests that the Government provide notice of Rule 404(b) evidence in advance of trial.  The Government has met its discovery obligations and is prepared to comply with whatever schedule the Court sets for further disclosures.  Accordingly, these requests should be denied.

14

**A.       The Government Is in Compliance With Its *Brady* and *Giglio* Obligations**

Under *Brady* v. *Maryland*, 373 U.S. 83 (1963), the Government is obligated by the Due Process Clause of the Fifth Amendment "to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  *United States* v. *Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).  Evidence is "material" under *Brady* only if disclosure of the evidence would lead to "a reasonable probability of a different result" in the outcome of a trial.  *Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

As stated in the Government's discovery letters to defense counsel, the Government has complied with its obligations pursuant to *Brady* and is not aware of any *Brady* material in this case.  The Government does, however, recognize its continuing obligation to disclose all such material, and to make a diligent search for any relevant material that may be in the possession of the "prosecution team," including investigating agents and officers.  The Government will provide timely disclosure of any *Brady* material if and when any such material comes to light.  Courts in this Circuit routinely deny specific requests for *Brady* material where, as here, the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*.  *See, e.g.*, *United States* v. *Young*, No. 10 Cr. 640, 2011 WL 838907, at *4 (S.D.N.Y. Mar. 9, 2011) ("[The Government] asserts that it will provide [*Brady*] materials if discovered 'in time for [their] effective use at trial,' as required by *United States* v. *Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).  This is sufficient.  Accordingly, the motion is moot."); *United States* v. *Gallo*, No. 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of purported *Brady* material

based on Government's representations that "it is aware of its obligations under *Brady . . .* and will produce any *Brady* material to the defense well before trial"); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

          With regard to impeachment material, courts in this Circuit have repeatedly refused to compel disclosure of *Giglio* material well in advance of trial, and Toro Naranjo has provided no specific or compelling basis for early disclosure here. *See United States* v. *Nixon*, 418 U.S. 683, 701 (1974) (noting that the "need for evidence to impeach witnesses is insufficient to require its production in advance of trial"); *Gallo*, 1999 WL 9848, at \*\*7-8 (denying defendants' motions to require the early production of *Giglio* and 3500 material); *United States* v. *Mejia*, No. 98 Cr. 4 (JGK), 1998 WL 456257 at \*1 (S.D.N.Y. Aug. 5, 1998); *United States* v. *Gutierrez-Flores*, No. 94 Cr. 393 (CSH), 1994 WL 558034, at \*3 (S.D.N.Y. Oct. 11, 1994). Similarly, with respect to the identities of confidential sources and cooperating witnesses, which are implicitly requested by Toro Naranjo's discovery request, the "general and well-established rule is that the Government enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" *United States* v. *Shamsideen*, No. 03 Cr. 1313 (SCR), 2004 WL 1179305, at \*11 (S.D.N.Y. Mar. 31, 2004) (quoting *Roviaro* v. *United States*, 353 U.S. 53, 59 (1957) and *United States* v. *Jackson*, 345 F.3d 59, 69 (2d Cir. 2003)). To overcome this qualified privilege against disclosure—often referred to as the informant's privilege—"[t]he defendant bears the burden of showing the need for a disclosure of an informant's identity, and to do so must establish that, absent such disclosure, he will be deprived

of his right to a fair trial." *United States* v. *Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (internal citation omitted).

Here, even if testimony or information from confidential sources is relevant and helpful to the defense, there are significant safety concerns justifying more limited disclosures closer to trial. Some of these witnesses have participated in multiple significant international drug-trafficking investigations. As such, early disclosure of the confidential sources' identities would put them, their relatives, and their associates at great personal risk. *See United States* v. *Jimenez*, 824 F. Supp. 351, 365 (S.D.N.Y. 1993) (where defendants failed to make sufficient showing as to how informants' testimony would be material to their defense, the Government's interest in protecting informants' safety outweighed need to learn informants' identities). Therefore, because the defendants have failed to overcome the informant's privilege, and because of the risks attendant to such early disclosures, the defendants request should be denied.

Nevertheless, in order to ensure that defense counsel is able to identify and address any potential *Giglio* issues, and otherwise prepare to defend against the charges set forth in the Indictment, the Government will produce its § 3500 and *Giglio* material ten days before trial—well before the statutory deadline and considerably earlier than is the usual practice in this District.

## B.    Rule 404(b) Notice

Toro Naranjo also moves for disclosure of evidence of acts and incidents that the Government seeks to introduce at trial pursuant to Federal Rule of Criminal Procedure 404(b). The Government respectfully submits that it will provide Rule 404(b) notice in advance of trial,

consistent with whatever schedule is set by the Court, as is standard practice in this District.  As such, this motion is premature.

## III.     Ricaurte-Gomez's *Pro Se* Suppression Motion Should Be Denied

Ricaurte-Gomez argues that essentially all of the discovery in this case should be suppressed principally for the following reasons: (i) the evidence was collected as a result of entrapment; (ii) the DEA did not receive approval from Colombia to conduct the investigation; and (iii) the evidence was collected in violation of the Fourth and Fifth Amendments.  (*See generally* Ricaurte-Gomez Br. at 12-37.)  These arguments are without merit.

First, the alleged entrapment of a defendant does not justify suppression of evidence collected during the investigation.  Entrapment is a defense to a criminal charge by which a defendant contests his or her predisposition to commit the offense. *United States* v. *Russell*, 411 U.S. 423, 429 (1973).  "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play."  *Id.* at 436. Construed most favorably to Ricaurte-Gomez, his motion to suppress argues an alleged violation of his due process rights caused by entrapment.  As explained above, the Due Process Clause may require suppression of evidence or dismissal of criminal charges if governmental conduct is particularly egregious, that is, sufficient to "shock[] the conscience."  *Al Kassar*, 660 F.3d at 121. Here, at most, the Government's investigation "creat[ed] . . . an opportunity for the commission of crime by those willing to do so."  *Myers*, 692 F.2d at 837.  Thus, suppression is not warranted. *See, e.g.*, *United States* v. *Hospedales*, 247 F. Supp. 2d 530, 541 (D. Vt. 2002) ("There being no

18

evidence that law enforcement officers engaged in outrageous conduct, [the defendant's] Motion to Dismiss and Suppress [evidence on the basis that he was entrapped] is denied.").

Second, Ricaurte-Gomez is simply wrong that the DEA did not have authority to participate in an investigation of the defendants in Colombia.  As set forth in the MLAT and other discovery in this case, which were produced to the defendants, the DEA was working in conjunction with Colombian authorities to investigate the defendants.  In fact, the MLAT references the investigation numbers assigned to Colombia's investigation of the defendants and other documents produced in discovery reflect that the DEA was working with Colombian law enforcement officials.  Moreover, Ricaurte-Gomez is simply wrong that DEA agents did not receive evidence directly from the Colombian Sensitive Investigation Unit and that they lied in affidavits about the source of their evidence.  Indeed, Ricaurte-Gomez cites no evidence in support of this contention.

To the extent Ricaurte-Gomez is arguing that the evidence was obtained in violation of Colombian law, that would not justify suppression.  "It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a . . . foreign government commits the offending act." *United States* v. *Janis*, 428 U.S. 433, 455 n.31 (1976); *see also United States* v. *Maturo*, 982 F.2d at 60; *Cotroni*, 527 F.2d 708, 712 (2d Cir. 1975); *Stowe* v. *Devoy*, 588 F.2d 336, 341 n.13 (2d Cir. 1978).  "[I]nformation furnished [to] American officials by foreign police need not be excluded simply because the procedures followed in securing it did not fully comply with our nation's constitutional requirements." *United States* v. *Cotroni*, 527 F.2d at 711. A United States court's exclusion of evidence obtained by foreign law enforcement would have

little, if any, deterrent effect, on the foreign law enforcement officer. *Id*. at 712; *Stowe* v. *Devoy*, 588 F.2d at 341 n.13. Thus, evidence obtained by foreign officials in violation of foreign law is still admissible in the United States.

Finally, the evidence in this case was not collected in violation of the Fourth or Fifth Amendments. As noted above, evidence obtained by foreign governments in violation of the Constitution is not subject to suppression. There are, however, two limited exceptions to this general rule. First, evidence that is obtained abroad through conduct that shocks the conscience may be suppressed by a court in the exercise of its supervisory powers. *See, e.g.*, *United States* v. *Mitro*, 880 F.2d 1480,1483 (1st Cir. 1989) ("Circumstances that will shock the conscience are limited to conduct that not only violates U.S. notions of due process, but also violates fundamental international norms of decency."). As detailed above, the conduct of law enforcement in this case does not come remotely close to meeting this standard.

Second, a suppression motion may be an available form of relief where United States law enforcement cooperation with foreign officials is so close as to trigger application of American constitutional restrictions. *United States* v. *Maturo*, 982 F.2d 57, 60-61 (2d Cir. 1992). Within this second category, constitutional requirements may attach in situations where (1) "the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials," or (2) "the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *Id*. The Second Circuit, however, has noted (in the context of the Jencks Act) that "[t]he investigation of crime increasingly requires the cooperation of foreign and United States

20

law enforcement officials, but there is no reason to think that Congress expected that such cooperation would constitute the foreign officials as agents of the United States." *United States* v. *Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984).

Here, the investigation was not a "joint venture."  None of Ricaurte-Gomez's allegations remotely suggest that the DEA collaborated with Colombia to such a degree that Colombian law enforcement was an agent of the DEA or that cooperation among the two agencies was designed to evade constitutional requirements.  Ultimately, Ricaurte-Gomez's allegations show nothing more than the typical collaboration between law enforcement agencies investigating international narcotics traffickers.  *See, e.g.*, *Maturo*, 982 F.2d 57, 60-61 (finding that the level of cooperation between the DEA and foreign officials "falls far short of the level needed to find the existence of a joint venture" even though the DEA provided money, information, translation services, and equipment to foreign authorities to obtain and maintain a wiretap on a DEA target located in Turkey).

In any event, even assuming a high level of DEA involvement in the investigation, the Fourth Amendment's prohibition on unreasonable searches and seizures still does not apply because the defendants are non-resident aliens, and the "search" at issue took place outside the United States.  *See United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 274-75 (1990).  In *Verdugo-Urquidez*, the Supreme Court held that the Fourth Amendment did not apply when the DEA searched residences in Mexico that belonged to a non-U.S. citizen, who had no other "voluntary attachment" to the United States.  *See id.* ("At the time of the search, [the defendant] was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched

21

was located in Mexico. Under these circumstances, the Fourth Amendment has no application.").

Relying on *Verdugo-Urquidez*, courts in this District have repeatedly recognized that the Fourth

Amendment does not apply to wiretaps of foreign citizens conducted in a foreign country,

regardless of the level of U.S. involvement. *See, e.g.*, *United States* v. *Coke*, No. 07 Cr. 971 (RPP),

2011 WL 3738969, at *4 (S.D.N.Y. Aug. 22, 2011) (explaining that parties agreed that the Fourth

Amendment did not apply to Jamaican wiretap, where the defendant had no "substantial, voluntary

attachment to the United States").

So too here.  The defendants are not United States citizens and have "no voluntary

attachment to the United States (other than their participation in a conspiracy to send controlled

substances here)."  *United States* v. *Gomez Castrillon*, No. 05 Cr. 156 (CM), 2007 WL 2398810,

at *3 (S.D.N.Y. Aug. 15, 2007).  The evidence at issue was collected on Colombian soil.  As such,

the Fourth Amendment simply does not apply.  Finally, even if the foreign collection of evidence

in this case was subject to the U.S. Constitution, suppression would not be warranted.  The

evidence collected principally consists of surveillance photographs of public locations and video

and audio recordings consensually obtained by confidential sources.  There is simply no basis to

suppress this evidence.  *See, e.g.*, *United States* v. *Barone*, 913 F.2d 46, 49 (2d Cir. 1990)

("Because the government made the recording with the consent of [one party to the conversation]

there was no need to inform [the defendant] or obtain a court order."); *United States* v. *Santobello*,

No. 94 Cr. 119 (RPP), 1994 WL 525053, at *1 (S.D.N.Y. Sept. 23, 1994) ("Controlling decisions

and statutory law clearly permit the warrantless electronic monitoring of communications based

on consent by one party."); *see also* 18 U.S.C. § 2511(2)(c).

22

## **Conclusion**

For the foregoing reasons, the Government respectfully submits that the defendants' motions should be denied.

Dated: New York, New York
       January 31, 2017

                                        Respectfully Submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York


                              By:   /s/ Matthew Laroche
                                    _____
                                    Brendan Quigley
                                    Negar Tekeei
                                    Matthew Laroche
                                    Assistant United States Attorneys
                                    Tel.: (212) 637-2190 / 2482 / 2420

Cc:    Defense Counsel
       (Via ECF)

23